REVISED DECEMBER 14, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-30100
_____


UNITED STATES OF AMERICA


                                   Plaintiff-Appellant

        v.


JESSE JAMES SMITH; KEISHA L. SMITH


                                   Defendants-Appellees

_____

        Appeals from the United States District Court
            for the Eastern District of Louisiana
_____
                     November 14, 2001

Before KING, Chief Judge, and DUHÉ and BENAVIDES, Circuit Judges.

KING, Chief Judge:

        Plaintiff-Appellant, the United States of America,

appeals the district court's suppression of evidence supporting

drug charges brought against Defendants-Appellees Jesse James

Smith and Keisha L. Smith.  For the following reasons, we REVERSE

the district court's ruling granting Defendants' motion to

suppress and REMAND for further proceedings.[1]

_____

    [1]  Although the motion to suppress was originally filed
only by Defendant-Appellee Jesse Smith, counsel for
Defendant-Appellee Keisha Smith advised the district court at the

## I. Factual and Procedural History

Defendants-Appellees Jesse James Smith and Keisha L. Smith ("the Smiths") took a one-week cruise aboard the M/S Celebration from the Port of New Orleans to several Caribbean destinations, including Jamaica. This cruise, conducted by Carnival Cruise Lines, began on September 17, 2000 and continued until September 24, 2000. In order to expedite the off-loading of hundreds of passengers when cruise ships return to port, Carnival Cruise Lines regularly makes passenger manifests available to the United States Customs Service ("U.S. Customs") once a ship is underway. U.S. Customs searches the manifests for any indication that narcotics smugglers are aboard.

In this case, U.S. Customs Inspector Mike Powell ("Inspector Powell") reviewed the passenger manifest for the M/S Celebration and noticed that the Smiths had profiles typical of narcotics smugglers. Jesse Smith had a prior conviction and was on parole at the time.[2] Keisha Smith had traveled by plane to Jamaica just four months before the cruise. The Smiths paid cash for their cruise tickets shortly before departing. Additionally, the ship's Caribbean destinations, particularly Jamaica, are known

---

start of the evidentiary hearing of her intention to join in the motion.

[2] When viewing the passenger manifest, the inspectors surmised that Jesse Smith left the country in violation of his parole but did not confirm this until later.

source and transit countries for narcotics.[3]  After discovering these facts, Inspector Powell pre-selected the Smiths for further investigation.

In the early hours of September 24, 2000, the final day of the cruise, the M/S Celebration returned to New Orleans.  Its passengers had been instructed to leave their luggage outside their rooms the night before and to vacate their rooms by 8:00 a.m.  Inspector Powell and other inspectors boarded the ship at 6:00 a.m.  The inspectors requested the records for the Smiths' cabin from the ship's purser's office.  The inspectors learned that although Jesse Smith's "sign and sail" account[4] showed frequent use until the ship left Jamaica, the account remained inactive after that time, indicating to inspectors that the Smiths remained in their room.[5]  Moreover, the Smiths placed a call or calls costing $142.50 to a single number in Jamaica on the day the ship arrived in Montego Bay.

---

[3]  The M/S Celebration also stopped in Grand Cayman and Cozumel, Mexico.

[4]  Cruise companies commonly employ "sign and sail" accounts to simplify the process by which passengers pay for their drinks, souvenirs, and special activities during the cruise.  At the beginning of the cruise, passengers fund the accounts with a cash deposit or a credit card and then charge beverages and other expenses to the account during the voyage.

[5]  The record of Keisha Smith's "sign and sail" account, if it existed, was never viewed by the inspectors and is not in the court record.

After obtaining this additional information from cruise records, the inspectors located the Smiths' cabin to conduct a search. They knocked on the door and asked the Smiths to dress and exit the cabin in order to allow a trained canine to search the room for drugs.[6] The dog first indicated the presence of drugs on the bed and then in a locker, where inspectors found four woven baskets. Coils containing 6.8 kilograms of cocaine were woven into the baskets. The search took approximately two or three minutes.

On October 19, 2000, the Smiths were charged with conspiracy to import at least five kilograms of cocaine on board a vessel in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 963 and with possession with the intent to distribute at least five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Jesse Smith pled not guilty to the charges. On November 13, 2000, Jesse Smith made a motion, joined by Keisha Smith, to suppress all the evidence seized from the Smiths' cruise cabin. The Government argued only that reasonable suspicion existed to support the search. After a hearing on the motion, the district court found that the inspectors did not have reasonable suspicion to support the search and granted the motion to suppress. United States v. Smith, No. CRIM.A.00-339, 2000 WL 1838708, at *3 (E.D.

---

[6] Neither party asserts that the Smiths consented to the search of their cabin. Thus, we do not consider the issue.

4

La. Dec. 13, 2000).  The Government timely filed notice of interlocutory appeal of the district court's ruling.[7]

## II.  Standard of Review

In an appeal of a ruling on a motion to suppress, this court reviews a district court's factual findings for clear error and its legal conclusions de novo.  United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir. 2001).  Whether there was reasonable suspicion for a search, a legal conclusion, is reviewed de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996).  At all times during this analysis, we view the evidence in a light most favorable to the prevailing party, i.e., the Defendants-Appellees.  Jacquinot, 258 F.3d at 427.  This court reviews any arguments not raised before a district court at a suppression hearing for plain error only.  United States v. Kelly, 961 F.2d 524, 528 (5th Cir. 1992).

---

[7]  Defendant-Appellee Keisha Smith has adopted on appeal the arguments submitted by co-defendant and co-appellee Jesse Smith.

### III.  The District Court's Analysis

Generally, routine searches at U.S. borders, or the functional equivalent of a border,[8] are reasonable under the Fourth Amendment and do not require a search warrant, probable cause, or even an articulable suspicion.  Cardenas, 9 F.3d at 1148; United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985).  This court has held, however, that some extremely intrusive border searches are not "routine" and must be predicated upon reasonable suspicion of criminal activity.  See, e.g., United States v. Sandler, 644 F.2d 1163, 1166 (5th Cir. 1981) (noting that border strip searches are not "routine" and require reasonable suspicion").  Citing a case from the Ninth Circuit[9] and a case from the Eastern District of Louisiana,[10] the district court found that "a search of a passenger's cabin aboard a ship is not routine given the intrusive nature of the search." Smith, 2000 WL 1838708, at *1.  "Accordingly, even in the context of a border search, the search of private living quarters on a

---

[8]  The first port where a ship docks after arriving from a foreign country is the "functional equivalent" of the border. United States v. Cardenas, 9 F.3d 1139, 1147-48 (5th Cir. 1993). The parties do not dispute that the search of the Smiths' cabin was a border search.

[9]  United States v. Alfonso, 759 F.2d 728, 738 (9th Cir. 1985) (stating that "the search of private living quarters on a ship should require something more than naked suspicion").

[10]  United States v. Cunningham, Crim. A. No. 96-265, 1996 WL 665747, at *3 (E.D. La. Nov. 15, 1996) (concluding that the proper standard to apply to a search of a cruise cabin at a border is reasonable suspicion).

ship must at least be supported by reasonable suspicion of criminal activity." Id. The district court found that the U.S. Customs inspectors lacked reasonable suspicion to support the search of the Smiths' cabin. Id. at *3.

On appeal, the Government has changed its tune and now argues that because this is a routine border search, reasonable suspicion is unnecessary. The Government failed to present this argument to the district court. Under these circumstances, the district court's application of the reasonable suspicion standard is subject to plain error review. Kelly, 961 F.2d at 528 (adopting the plain error standard when considering "an argument that the Government failed to raise at a suppression hearing"). This deferential standard of review dictates that before this court can correct an error not raised at trial, there must be (1) an "error," (2) that is "plain," (3) that "affect[s] substantial rights," and (4) that "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732 (1993) (internal citations and quotations omitted). While it may well be the case that applying a reasonable suspicion standard to the search of the Smiths' cabin at the functional equivalent of a border is plain error, we need not decide the issue. Our determination that reasonable suspicion existed in this case assures that the district court's error did not affect the Government's substantial rights or the fairness, integrity, or public reputation of judicial

7

proceedings. Thus, the search of the Smiths' cabin was valid, and the district court erred in suppressing the evidence seized pursuant to that search.

## IV. Reasonable Suspicion

Reasonable suspicion entails "some minimal level of objective justification" that consists of "more than inchoate or unparticularized suspicion or 'hunch,'" but less than the level of suspicion required for probable cause. United States v. Sokolow, 490 U.S. 1, 7 (1989)(internal citations and quotations omitted). Reasonable suspicion must be based upon "specific facts which, taken together with rational inferences therefrom, reasonably warrant an intrusion." Cardenas, 9 F.3d at 1153. We consider the totality of the circumstances in determining whether reasonable suspicion existed at the time of the search. Id. at 1148.

In this case, U.S. Customs inspectors uncovered numerous facts raising the suspicion that the Smiths were involved in narcotics smuggling. First, the Smiths took a cruise bound for Jamaica. At the suppression hearing, Inspector Powell testified that Jamaica is a transit point for Colombian cocaine and heroin bound for the United States. Inspector Powell also indicated that Jamaica is a source country for "quite a bit" of marijuana that comes into the United States. Second, Keisha Smith traveled

8

by air to Jamaica just four months before she took the cruise that stopped in Jamaica. Inspector Powell noted that frequent trips to the same source or transit country within a short period of time are unusual. Third, although an "overwhelming majority" of cruise passengers buy their tickets with some type of credit instrument, the Smiths purchased their cruise tickets with cash. Inspector Powell testified that such behavior is typical of narcotics smugglers attempting to "hide a financial trail."

Fourth, the Smiths bought their tickets just over two weeks before the date of departure. Most cruise passengers purchase tickets well in advance to allow for sufficient planning. According to Inspector Powell, the Smiths' "late or last-minute booking" is consistent with narcotics smuggling because the narcotics business "is a very fluid business – business plans aren't set firm." Fifth, Jesse Smith had an "extensive criminal history" that included "arrests and convictions" and was on parole at the time of the cruise. Because foreign travel is generally a violation of parole, Inspector Powell surmised that Jesse Smith's purpose in taking the cruise "must have been pretty significant, which could have been narcotics smuggling." Sixth, just before docking in Montego Bay, the Smiths placed an unusual "shoreside" call or calls costing $142.50 to a single number in Jamaica. Inspector Powell felt the call was "very significant"

9

and was possibly "a contact with a provider of narcotics shoreside."[11]

Finally, Inspector Powell argues that the Smiths' "sign and sail" account raises suspicion. Before docking in Montego Bay, Jamaica, the account "showed a consistent pattern of behavior" similar to that of most cruise passengers. The "sign and sail" account documented that the Smiths purchased drinks from various bars throughout the ship at regular intervals. After leaving Montego Bay, the Smiths' "sign and sail" account showed no further activity, suggesting to inspectors that the Smiths remained in their room for the duration of the cruise. In cross-examination, Inspector Powell admitted that after leaving Montego Bay, the balance in the Smiths' "sign and sail" account had dropped to zero. The district court states that this fact is "devastating to the Government's position" because "the most likely inference [is] that all activity ceased on the account after September 20th because the deposited funds were exhausted." Smith, 2000 WL 1838708, *3. We must draw all reasonable inferences in favor of the Smiths, and the zero balance on the account reasonably explains the lack of further activity on that account. Thus, the fact that account activity ceased after leaving Jamaica does not raise any suspicion and does not support our conclusion of reasonable suspicion. However, because the

---

[11] The U.S. Customs inspectors never attempted to ascertain to whom the call or calls were made.

10

inspectors would have had reasonable suspicion even if the Smiths had continued normal use of the "sign and sail" account for the duration of the cruise, we do not find the zero balance "devastating to the Government's position."

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court confronted facts similar to those in the instant case. In Sokolow, the defendant and his accomplice made a round-trip flight to Miami from Honolulu with tickets purchased the same day of the flight. Id. at 4. After the defendant paid $2100 for the two tickets from a roll of $20 bills, the airline ticket agent notified the Honolulu Police Department of the suspicious transaction. Id. Further investigation revealed that the defendant traveled under a name that did not match the name under which his telephone number was listed, that he stayed in Miami for only forty-eight hours, that he appeared nervous during his trip, and that he and his companion did not check any of their luggage. Id. at 3. These facts, coupled with the knowledge that Miami is a source city for illicit drugs, led Drug Enforcement Administration agents to search the defendant's luggage when he returned to Honolulu. Id. The search yielded 1063 grams of cocaine. Id. Reversing the Ninth Circuit, the Supreme Court found that although "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel[,] . . . taken together they amount to reasonable suspicion." Id. at 9.

11

Several of the suspicious facts in this case mirror those involved in Sokolow, including the Smiths' last-minute purchase of cruise tickets with cash and the notoriety of their Jamaican destination as a narcotics source. Although each action taken by the Smiths, standing alone, could be consistent with innocent behavior, all of the actions taken together justified Inspector Powell's "very strong suspicion" that the Smiths were involved in narcotics smuggling. Inspector Powell also based his conclusions upon nine months of similar work. The Supreme Court has noted that a trained investigator may be "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." Brown v. Texas, 443 U.S. 47, 52 n.2 (1979). Thus, Inspector Powell's experience with locating narcotics on cruise ships further substantiates his suspicions.

For these reasons, we find that the totality of the circumstances in this case creates a reasonable suspicion of criminal activity. Thus, assuming arguendo that reasonable suspicion was required, the search of the Smiths' cabin was valid. The district court's suppression of all evidence seized pursuant to the search was erroneous.

**V. Conclusion**

We REVERSE the district court's ruling granting the Smiths' motion to suppress the evidence and REMAND for further proceedings.

Benavides, Circuit Judge, concurs in the judgment only.