

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-15-2004

# USA v. Aleman-Figuereo

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-4506

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Aleman-Figuereo" (2004). *2004 Decisions.* Paper 76.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/76

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

No. 03-4506

—————

UNITED STATES OF AMERICA

v.

JOSE ALEMAN-FIGUEREO,
Appellant

—————

On Appeal from the District Court of the Virgin Islands
(D.C. Crim. No. 03-cr-00016)
District Judge:  Honorable Thomas K. Moore

—————

Submitted Under Third Circuit LAR 34.1(a)
December 13, 2004

Before:  SLOVITER, FUENTES and GREENBERG, Circuit Judges.

(Filed: December 15, 2004)

—————

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Jose Aleman-Figuereo appeals the decision of the District Court of the Virgin Islands denying his motion to suppress the evidence of approximately 1.4 kilograms of heroin obtained by United States Customs Officers in their search of the safe located in Aleman-Figuereo's cruise ship cabin. Aleman-Figuereo pled guilty to one count of possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), but reserved the suppression issue for this appeal. We have jurisdiction of his timely appeal pursuant to 28 U.S.C. §§ 1291, 1294(3). We will affirm.

**I.**

We need to recite the relevant facts more fully than we do in other non-precedential opinions because of the highly factual nature of Aleman-Figuereo's Fourth Amendment challenge. In January of 2003, Aleman-Figuereo was a passenger onboard the Adventures of the Sea cruise ship. The cruise itinerary included stops in Puerto Rico and St. Thomas, as well as several foreign locations, including Aruba, Curacao, and St. Maarten, all three of which are known drug source countries. Jose Figueroa, who had been a customs inspector for seven years and who works out of the United States Immigration and Customs Enforcement Office in San Juan, Puerto Rico, learned from the advanced cruise ship passenger manifest that three to four weeks prior, Aleman-Figuereo had traveled on the same vessel, with the same seven-day itinerary. Inspector Figueroa also learned that Aleman-Figuereo had purchased the tickets for his second cruise within

2

two to three days of its departure.

Inspector Figueroa and other customs inspectors from the San Juan office traveled to St. Thomas to assist in the search of the Adventures of the Sea cruise ship on January 18, 2003. Once the customs inspectors were onboard the vessel in the Virgin Islands, ship security personnel informed them that Aleman-Figuereo and his companion acted "strange, not normal" as "they didn't come out a lot from the cabin." App. at 34.

Accompanied by customs officers and national guardsmen, ship security personnel entered Aleman-Figuereo's locked cabin and announced Inspector Figueroa and his colleagues. In response to Inspector Figueroa's requests, Aleman-Figuereo congenially answered questions and permitted a search of the cabin. Because the cabin safe was closed and locked, Inspector Figueroa directed Aleman-Figuereo to open the safe with his combination. At first, Aleman-Figuereo denied using the safe or knowing the combination. After Inspector Figueroa informed him that a closed safe necessarily indicated that it was locked by a personal combination, Aleman-Figuereo tried several times to open the safe to no avail. Inspector Figueroa then directed the security personnel to find a crew member to open the safe. Aleman-Figuereo asserts that a crew member unlocked the safe, while Inspector Figueroa insists that Aleman-Figuereo opened the safe after his female companion gave him a combination. The difference is insignificant. The safe contained a wallet, a birth certificate, and, significantly, a pair of spandex shorts with packages of heroin sewn into the seams. Aleman-Figuereo was

3

subsequently read his rights and taken to another part of the vessel for further questioning.

By information dated January 27, 2003, Aleman-Figuereo was charged with one count of possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), and another count of importation of heroin in violation of 21 U.S.C. § 952(a). Aleman-Figuereo filed a motion to suppress the contraband obtained from the search. At the suppression hearing on April 16, 2003, the District Court denied Aleman-Figuereo's motion on the grounds that the customs officers executed a routine border search. The Court also made the alternative finding that the officers had reasonable suspicion to search Aleman-Figuereo's cabin and the locked safe therein.[1]

Aleman-Figuereo pled guilty to the first drug trafficking count in a conditional plea agreement, dated May 14, 2003, which also permitted him to appeal the District Court's suppression ruling. On October 31, 2003, Aleman-Figuereo was sentenced to the statutory minimum of 120 months incarceration with five years of supervised release. This timely appeal followed.[2]

---

[1] During the April 16, 2003 suppression hearing, the parties rigorously disputed the scope of Aleman-Figuereo consent to search the cabin premises. Because the District Court decided the motion on other grounds, it did not make a finding as to whether Aleman-Figuereo consented to the search of his cabin or cabin safe therein.

[2] Aleman-Figuereo submitted additional papers pro se, challenging the District Court's decision on grounds comparable to those articulated by his current counsel. Aleman-Figuereo also asserts a Sixth Amendment challenge to the performance of his pretrial counsel during the plea negotiations. As it is well established in this circuit that ineffective assistance of counsel claims are not entertained on a direct appeal, United

## II.

We review the District Court's denial of the motion to suppress for clear error as to the underlying factual findings and exercise plenary review of the District Court's application of the law to those facts. United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002).

There is no dispute that the search of Aleman-Figuereo's cabin occurred at the "functional equivalent" of an international border. In United States v. Hyde, 37 F.3d 116 (3d Cir. 1994), this court recognized the United States Virgin Islands as a longstanding customs border. We follow the approach taken by the Court of Appeals for the Fifth Circuit which construed the first port where a vessel docks upon its arrival from a foreign country as the "functional equivalent" of a customs border. United States v. Cardenas, 9 F.3d 1139, 1147-1148 (5th Cir. 1993) (citing Almeida-Sanchez v. United States, 413 U.S. 266, 272 (1973)). When Aleman-Figuereo's cabin was searched, the Adventure of the Sea cruise ship was docked at St. Thomas en route from the foreign nations of Curacao and St. Maarten. Therefore, the search qualifies as a border search for the purpose of the Fourth Amendment.

The Supreme Court has repeatedly held that "'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and

States v. Headley, 923 F.2d 1079, 1083 (3d Cir. 1991), we will dismiss Aleman-Figuereo's Sixth Amendment challenge without prejudice to his right to raise the issue in an appropriate collateral proceeding.

5

examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" United States v. Flores-Montano, ___ U.S. ___, 124 S.Ct. 1582, 1585 (2004) (quoting United States v. Ramsey, 431 U.S. 606, 616 (1977)); see also United States v. Glasser, 750 F.2d 1197, 1200 (3d Cir. 1984) ("One of the inherent powers of a sovereign is the power to restrict or regulate the entry of persons and property across the border."). Accordingly, customs officials, among others, have the authority to perform routine border searches without warrant, probable cause, or reasonable suspicion. See United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985); see also United States v. Martinez-Fuerte, 428 U.S. 543, 562-64 (1976) (holding that border searches conducted at roadway checkpoints, even those made primarily on basis of race, are constitutional even in absence of individualized suspicion).

Our decisions have followed the Supreme Court's precedent. See, e.g., Bradley v. United States, 299 F.3d 197, 201-05 (3d Cir. 2002) (finding that pat down by customs inspectors which entailed both prodding of external genitalia and breasts was part of routine search of air passenger arriving at U.S. airport from Jamaica); United States v. Ezeiruaku, 936 F.2d 136, 140-41 (3d Cir. 1991) (holding that search of outbound luggage to Germany at U.S. airport is routine).

In contrast, non-routine border searches require reasonable suspicion. Montoya de Hernandez, 473 U.S. at 541; Ezeiruaku, 936 F.2d at 140. This category of search stands as a narrow exception to customs officials' broad authority and is reserved for searches

that are highly intrusive and pose serious threats to the dignity and privacy interests of the person being searched. Flores-Montano, 124 S.Ct. at 1585; Montoya de Hernandez, 473 U.S. at 541 (holding that detention of border crosser so that bowel movements could be monitored for evidence of drug smuggling was not routine); see also Bradley, 299 F.3d at 203-04 ("[W]e do not foreclose the possibility that a patdown gone awry could become so intrusive as to become a nonroutine search requiring application of the reasonable suspicion standard.").

Aleman-Figuereo contends that the search of his cabin and the safe therein was intrusive and non-routine because the customs officers deliberately flew from Puerto Rico to St. Thomas to conduct the search. Aleman-Figuereo further contends that the search was unlawful because the officers had neither the requisite reasonable suspicion nor his consent.

Aleman-Figuereo's position ignores the weight of binding judicial authority. Whether or not a border search is routine does not turn on the efforts of customs officials to arrive at a particular customs border. Rather, it depends on the quality of the search, i.e., whether it was intrusive to such an extent that it genuinely affected the privacy interests of the person searched. See Flores-Montano, 124 S.Ct. at 1585; Montoya de Hernandez, 473 U.S. at 541; Bradley, 299 F.3d at 203-04.

Neither the Supreme Court nor this court has addressed whether the search of a cabin of a cruise ship at a customs border is sufficiently intrusive to require reasonable

7

suspicion. Other courts presented with the issue have declined to adopt a generally applicable rule, instead relying on the facts of the particular case to decide whether there was reasonable suspicion, thereby obviating the need to address the issue of routine search vel non. See, e.g., United States v. Smith, 273 F.3d 629, 634 (5th Cir. 2001) (holding customs officials had reasonable suspicion because occupants of cabin fit drug smuggler profiles); United States v. Brown, 298 F. Supp. 2d 1317, 1320 n.2 (S.D. Fla. 2004) (denying motion to suppress after finding reasonable suspicion). But see United States v. Alfonso, 759 F.2d 728, 738 (9th Cir. 1985) (holding reasonable suspicion required when search involved cabin on large shipping vessel that constituted living quarters of occupant).[3]

Because the customs officials here clearly possessed reasonable suspicion, the case before us is not the occasion to announce a general rule applicable to the search of a cruise ship cabin. Thus, we need not address whether the search of Aleman-Figuereo's cabin was a routine or non-routine border search. If routine, the search would have been lawful without any showing of reasonable suspicion by customs officers or consent by Aleman-Figuereo. If non-routine, the search would also be lawful, as the totality of the

---

[3] We have alluded to the public nature of a roomette aboard an interstate train in considering whether a passenger's consent to a search was given freely. See United States v. Kim, 27 F.3d 947 (3d Cir. 1994). In dictum, we suggested approval of the district court's finding that the roomette was public, where the roomette occupant left its door open despite its proximity to heavily populated areas of the train. Id. at 952 n.2; see also United States v. Whitehead, 849 F.2d 849, 854-55 (4th Cir. 1988) (holding that passengers have reduced expectation of privacy in railway sleeping compartments).

circumstances in this case created a reasonable suspicion that Aleman-Figuereo was engaged in narcotics smuggling thereby justifying the officers' search of his cabin and the cabin safe.

Under the reasonable suspicion standard, customs officials must have a "particularized and objective basis" to suspect legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation and citation omitted). We must review the totality of the circumstances of each case. Id. at 274. It is not sufficient under this standard that the inspectors can articulate reasons why they searched Aleman-Figuereo's cabin if those reasons are not indicative of behavior in which few innocent people engage. See Karnes v. Skrutski, 62 F.3d 485, 493 (3d Cir. 1995). "[T]he factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion would be satisfied." Id.

In this case, customs inspectors uncovered numerous factors prior to approaching Aleman-Figuereo's cabin that raised the suspicion that Aleman-Figuereo was involved in drug smuggling. First, Aleman-Figuereo took a cruise bound for several known drug source countries. Second, he had traveled on the very same cruise with the same exact itinerary only three to four weeks prior. Third, Aleman-Figuereo purchased his passage on the second voyage only a few days prior to departure. Lastly, cruise ship personnel observed that Aleman-Figuereo and his companion barely left their cabin. Although each factor standing alone could be consistent with innocent behavior, all of these factors,

taken as a whole, support the District Court's finding that the customs inspectors had reasonable suspicion to search the contents of Aleman-Figuereo's cruise ship cabin for contraband. Furthermore, the Supreme Court has acknowledged that reasonable suspicion analysis permits "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative informative available to them that might well elude an untrained person." Arvizu, 534 U.S. at 273 (internal citations and quotations omitted). Hence, Inspector Figueroa's seven years experience as a customs inspector in Puerto Rico and his expertise with contraband smuggling further serve to substantiate the District Court's finding of reasonable suspicion.

Because there was reasonable suspicion, we need not consider Aleman-Figuereo's argument that he did not consent to the search of the cabin generally, or to the locked cabin safe in particular. Our determination that the customs officers had reasonable suspicion to search Aleman-Figuereo's cabin and the safe therein assures that the search was lawful under the Fourth Amendment and that the District Court properly denied the motion to suppress the contraband uncovered during the search of Aleman-Figuereo's cabin.

**III.**

For the foregoing reasons, we will affirm the judgment of conviction.