[No. B199726. Second Dist., Div. Eight. June 4, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK STEVENS LABORDE, Defendant and Appellant.

Counsel

Nisson & Nisson and Peter Nisson for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon and A. Scott Hayward, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

COOPER, P. J.—

### SUMMARY

This is an appeal from the denial of a motion to suppress evidence under Penal Code section 1538.5. Defendant asserts that the search of his stateroom on a cruise ship by a customs officer, after the ship docked in Long Beach at

the conclusion of a foreign cruise, was conducted without reasonable suspicion of criminal activity and therefore violated the Fourth Amendment. The People assert the search was a routine border search for which reasonable suspicion is not required. We agree with the People and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Mark Stevens Laborde pled guilty to a charge of possession of a controlled substance (methamphetamine) and was sentenced to three years' formal probation. The methamphetamine was found during a search of a stateroom on a Carnival Cruise Line vessel shared by Laborde and his girlfriend. The ship had just docked in Long Beach on its return from a cruise to Mexico.

Crew and passenger lists are provided in ordinary course to United States customs by the cruise line. Analysis of the passenger list provided by Carnival showed Laborde previously had been arrested on narcotics and drug paraphernalia charges, so customs officers decided to conduct a search of Laborde's cabin. At approximately 6:20 a.m., the officers proceeded to Laborde's stateroom. The officers knocked and Laborde's girlfriend answered. She was informed the officers were going to do a cabin exam. Laborde was still asleep when the officers entered the cabin. His girlfriend awakened him and the officers identified themselves again. After Laborde arose, dressed, and denied having anything illegal in the cabin, Officer Eric Clark conducted a search while Laborde and his girlfriend waited in the hallway with another officer. In a yellow backpack, Clark discovered a glass container with a crystal substance, later found to be methamphetamine. Clark also found a glass pipe on the bedstand. Laborde admitted the backpack was his, and was taken into custody and turned over to the Long Beach Police Department.

The trial court denied Laborde's motion to suppress the evidence found during the search of his stateroom. The court observed the search was a border search that could be conducted without reasonable suspicion. Laborde pled guilty, reserving his right to appeal the denial of the suppression motion.

The plea was accepted, imposition of sentence was suspended, and Laborde was placed on formal probation for three years under Proposition 36.

This appeal followed.

## DISCUSSION

■ The first port where a vessel docks on arrival from a foreign country is the functional equivalent of an international border, so that the search of Laborde's cabin was a border search for Fourth Amendment purposes. "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . . ." (*United States v. Montoya de Hernandez* (1985) 473 U.S. 531, 538 [87 L.Ed.2d 381, 105 S.Ct. 3304] (*Montoya de Hernandez*).) In *United States v. Flores-Montano* (2004) 541 U.S. 149 [158 L.Ed.2d 311, 124 S.Ct. 1582] (*Flores-Montano*), the high court explained: "The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. Time and again, we have stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.' [Citation.] Congress, since the beginning of our Government, 'has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.' [Citation.]"[1] (*Flores-Montano, supra,* 541 U.S. at pp. 152–153.)

Nonroutine border searches, however, are another matter. The high court has not opined "on what level of suspicion, if any, is required for nonroutine border searches such as strip, body-cavity, or involuntary x-ray searches." (*Montoya de Hernandez, supra,* 473 U.S. at p. 541, fn. 4; see *Flores-Montano, supra,* 541 U.S. at p. 152.) The high court has held, however, that the detention of a traveler at the border, "beyond the scope of a routine customs search and inspection," was justified when there was reasonable suspicion that the traveler was smuggling contraband in her alimentary canal. (*Montoya de Hernandez, supra,* 473 U.S. at p. 541.) And many federal courts since *Montoya de Hernandez* have held that nonroutine border searches require

---

[1] The statute authorizing the search in *Flores-Montano* derived from a statute passed in 1790. (*Flores-Montano, supra,* 541 U.S. at p. 153.) Section 1581(a) of title 19 of the United States Code states: "Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board . . . ."

reasonable suspicion.[2] (See, e.g., *U.S. v. Ramos-Saenz* (9th Cir. 1994) 36 F.3d 59, 61–62 (*Ramos-Saenz*) [detention of traveler beyond the scope of a routine search and inspection requires reasonable suspicion; removal of shoes was well within scope of a routine border search]; *U.S. v. Cardenas* (5th Cir. 1993) 9 F.3d 1139, 1148, fn. 3 ["lower courts have generally classified routine searches as those which do not seriously invade a traveler's privacy"; reasonable suspicion standard has been applied to nonroutine searches such as X-ray examinations and strip searches].)

■ Consequently, the current state of the law is that there are two categories of border searches: routine searches that require no suspicion at all and nonroutine searches that require reasonable suspicion. Border searches found to be routine, requiring no suspicion, include vehicle searches entailing the removal, dismantling and reassembling of the vehicle's fuel tank (*Flores-Montano, supra*, 541 U.S. at p. 155), and patdown searches. (See, e.g., *Bradley v. U.S., supra*, 299 F.3d at pp. 203–205 [patdown, done over clothing and including pushing on breasts and external genitalia, "was not so intrusive as to be transformed into a nonroutine border search"; customs officials are permitted as a matter of standard procedure to feel over clothing for bulges in an area known by them as a common place for hiding contraband].)

No controlling authority exists on the question presented by this case: whether the search of a passenger cabin of a cruise ship at a customs border is sufficiently intrusive to require reasonable suspicion. (*U.S. v. Aleman-Figuereo* (3d Cir. 2004) 117 Fed.Appx. 208, 211 (*Aleman-Figuereo*).) Courts presented with the issue "have declined to adopt a generally applicable rule, instead relying on the facts of the particular case to decide whether there was reasonable suspicion, thereby obviating the need to address the issue . . . ."[3] (117 Fed.Appx. at p. 211.) A few cases have proffered thoughts on the point, but without any extended analysis. Thus:

---

[2] Prior to *Montoya de Hernandez*, varying levels of suspicion were found to justify various types of border searches, such as a " 'clear indication,' " "reasonable suspicion," " 'mere suspicion,' " and " 'no suspicion.' " (*Bradley v. U.S.* (3d Cir. 2002) 299 F.3d 197, 202 & fn. 5.) In *Montoya de Hernandez, supra*, 473 U.S. at p. 541, the high court observed: "We do not think that the Fourth Amendment's emphasis upon reasonableness is consistent with the creation of a third verbal standard in addition to 'reasonable suspicion' and 'probable cause'; we are dealing with a constitutional requirement of reasonableness, not *mens rea* [citation], and subtle verbal gradations may obscure rather than elucidate the meaning of the provision in question."

[3] In *Aleman-Figuereo*, customs officials "clearly possessed reasonable suspicion" the defendant was engaged in narcotics smuggling, thereby justifying the search of a safe in his cruise ship cabin. (*Aleman-Figuereo, supra*, 117 Fed.Appx. at p. 212.) See also *U.S. v. Brown* (S.D.Fla. 2004) 298 F.Supp.2d 1317, in which customs agents ran a trained canine through the ship's hallways after passengers had disembarked during a stop in Key West. They targeted the

—In *U.S. v. Smith* (5th Cir. 2001) 273 F.3d 629, the trial court had found that a search of a passenger's cabin " 'is not routine given the intrusive nature of the search,' " and that customs inspectors lacked reasonable suspicion of criminal activity. (*Id.* at p. 633.) On review, however, the court of appeals observed that "[w]hile it may well be the case that applying a reasonable suspicion standard to the search of the Smiths' cabin at the functional equivalent of a border is plain error," it did not have to decide that issue because reasonable suspicion existed to justify the search. (*Ibid.*)

—In *State v. Logo* (La.Ct.App. 2001) 798 So.2d 1182, the Louisiana Court of Appeal held that customs agents, while having authority to conduct a border search of the vessel without reasonable suspicion, "required more than naked suspicion to search a passenger's cabin." (*Id.* at p. 1184.) The court did not discuss or cite any authority for the point, and went on to find the customs agents had reasonable suspicion to search the cabin. (*Ibid.*)

—In *U.S. v. Rasheed* (D. Hawaii 1992) 802 F.Supp. 312, 325, the court found, as an alternative holding and without analysis, that the Coast Guard's search of the defendants' personal living quarters on a vessel (which was boarded in international waters and found to be carrying 70 tons of hashish) was justified as a border search, which "need not be supported by a warrant or reasonable suspicion."[4] (802 F.Supp. at p. 325.)

—In *United States v. Alfonso* (9th Cir. 1985) 759 F.2d 728 (*Alfonso*), the court observed: "Obviously, a search of the private living quarters of a ship is more intrusive than a search of other areas. [Citations.] The private living quarters are at least analogous to a private dwelling. As a result, even in the context of a border search, the search of private living quarters on a ship should require something more than naked suspicion."[5] (*Alfonso, supra*, 759 F.2d at pp. 737–738.)

hallways in which defendant Brown's cabin was located. After a canine alert, cocaine was discovered in the subsequent search of Brown's luggage. The court stated the search amounted to a routine border search, because customs agents routinely utilized trained canines to detect narcotic odor from the hallways of cruise ships, and the search of Brown's cabin "possessed no characteristics to distinguish it from a routine border search." (*Id.* at p. 1320.) The court noted that, even if the entry into and search of Brown's cabin was not a routine border search, the dog's alert provided reasonable suspicion to enter and search the cabin. (*Id.* at pp. 1319–1320 & fn. 2.) The district court rejected the claim that use of the canine and subsequent search became nonroutine because the customs agents had targeted Brown and others for surveillance based on a review of passenger information. (*Id.* at p. 1320.)

[4] The court's principal holding was that the Fourth Amendment does not apply to the search of nonresident aliens on a ship in international waters. (*U.S. v. Rasheed, supra*, 802 F.Supp. at p. 325.) Moreover, undercover agents working on the case knew the ship was carrying the hashish, and so had probable cause to stop the vessel. (*Id.* at p. 325, fn. 13.)

[5] In *Alfonso*, the entire vessel was searched under the "extended border search" doctrine. An extended border search requires reasonable suspicion of criminal activity, and occurs subsequent to a border crossing (in *Alfonso*, a day and a half after the ship's arrival and after an

■ We conclude from the available precedents that the search of a passenger cabin of a cruise ship at a customs border is a routine border search, requiring no suspicion of criminal activity. We note at the outset the point stated in *Flores-Montano,* with respect to vehicle searches at the border: "[T]he reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person—dignity and privacy interests of the person being searched—simply do not carry over to vehicles. Complex balancing tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border searches of vehicles." (*Flores-Montano, supra,* 541 U.S. at p. 152.)

We similarly find that the reasons supporting a requirement of reasonable suspicion in "highly intrusive searches of the person" do not carry over to the border search of a passenger's stateroom. A routine search of a passenger's stateroom does not implicate any dignity interest of the person whose cabin is searched, as body-cavity and strip searches of the person do. And the privacy interest in one's cabin at the border can surely be no greater than the privacy interest in one's person and effects, both of which are subject to routine search at the border.

■ We recognize that the *Alfonso* court analogized "private living quarters" of a ship to a private dwelling, and "one's dwelling has generally been viewed as the area most resolutely protected by the Fourth Amendment." (1 LaFave, Search and Seizure (4th ed. 2004) § 2.3, p. 554.) However, the analogy simply fails at the border. The Fourth Amendment protects the right of the people to be secure, "in their persons, houses, papers, and effects," against unreasonable searches and seizures. The Supreme Court has long said in no uncertain terms that routine border searches are permissible under the Fourth Amendment. (*United States v. Ramsey* (1977) 431 U.S. 606, 619 [52 L.Ed.2d 617, 97 S.Ct. 1972] (*Ramsey*) ["[b]order searches, then, from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside"; the "longstanding recognition that searches at

---

initial cursory search). Because such searches occur after actual entry has been effected, they "intrude more on an individual's normal expectation of privacy," and hence must be justified by reasonable suspicion. (*Alfonso, supra,* 759 F.2d at p. 734.) The court found reasonable suspicion existed that contraband was aboard the vessel, so the search of the vessel was a valid extended border search, and "at least the same level of reasonable suspicion sufficiently supported the search of private living quarters aboard the ship during that search." (*Alfonso, supra,* 759 F.2d at p. 738; accord, *U.S. v. Eltayib* (E.D.N.Y. 1992) 808 F.Supp. 160, 163 [rejecting contention that search of crew members' living quarters was improper and citing *Alfonso* for proposition that border search of vessel could extend to the crew's living quarters on reasonable suspicion that contraband was on board].)

our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself"].) As the Supreme Court has also said, " 'a port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search.' " (*Ramsey, supra,* 431 U.S. at p. 618, quoting *United States v. Thirty-seven Photographs* (1971) 402 U.S. 363, 376 [28 L.Ed.2d 822, 91 S.Ct. 1400].)

The incontrovertible principle is that, at the border of this country, routine searches of "persons, . . . papers, and effects" are permissible without any level of suspicion. We can deduce no coherent basis for applying a higher level of Fourth Amendment protection to persons who cross the border ensconced in the arguable equivalent of "houses" or dwellings. In other words, the Fourth Amendment protects the people's right to be secure "in their persons, houses, papers, and effects"—but not at the border. If the "person" and his or her "papers, and effects" are not protected by the Fourth Amendment at the border, it seems fundamentally unsound to accord protection to the stateroom in which he or she crosses the border, on the ground it is analogous to "a private dwelling." (*Alfonso, supra,* 759 F.2d at p. 738.) If a person approached the border in a recreational vehicle or motor home used as a dwelling, no one would seriously suggest that a routine search of that conveyance could not be performed. (Cf. *California v. Carney* (1985) 471 U.S. 386, 387, 393–394 [85 L.Ed.2d 406, 105 S.Ct. 2066] [no distinction between a fully mobile motor home located in a public place and an ordinary sedan for purposes of vehicle exception to warrant requirements].) The fact that such vehicles function as the private dwellings of those who occupy them does not serve to exempt them from inspection. We can find no reasoned basis for treating the passenger cabins on cruise ships any differently.

■ We return, then, to the only basis upon which a search at the border may require reasonable suspicion: is it so intrusive that it cannot be considered routine? Clearly not. As the Ninth Circuit observed in *Ramos-Saenz,* "the degree of intrusiveness is a critical factor in distinguishing between routine and non-routine searches," and intrusiveness "includes both the extent of a search as well as the degree of indignity that may accompany a search." (*Ramos-Saenz, supra,* 36 F.3d at p. 61 & fn. 3.) "[A] border search goes beyond the routine only when it reaches the degree of intrusiveness present in a strip search or body cavity search." (*Id.* at p. 61.) But the only "intrusive"

aspect of the search of a passenger cabin, in and of itself, is the arguable analogy to a private dwelling. And, as we have seen, the search of a "dwelling" at the border logically cannot be distinguished from the search of the person and his effects.

Laborde complains that the search was conducted by "forcible entry," early in the morning when a person would normally be sleeping, and that "[b]eing ordered out of [his] cabin . . . while being watched by customs officials was . . . a most embarrassing procedure." We cannot agree that embarrassment renders a search nonroutine. First, Laborde cites no evidence of "forcible entry" and there was none: the officer knocked on the door, and "a female answered the door." Second, the time of the search is controlled by the time of the border crossing, and in any event there is nothing about an early morning search that implicates a dignity interest.[6] Third, the fact that a procedure is "embarrassing" does not mean it is highly intrusive. It is hard to see how a cabin search is any more "embarrassing" than any other search of one's person and effects at the border. Indeed, while a patdown, including pushing on breasts and external genitalia, was "no doubt, a disagreeable experience," it came within the routine border search category and required no suspicion whatsoever. (*Bradley v. U.S., supra*, 299 F.3d at pp. 201, 205, 203 [since *Montoya de Hernandez*, no court of appeals has held that a standard patdown at the border is a nonroutine search requiring reasonable suspicion].) Certainly a cabin search is no more "disagreeable" than the patdowns in *Bradley* and other cases. Finally, Laborde contends the search was not routine because it was "based on [Laborde's] history." This contention has no merit; "the validity of a border search does not depend on whether it is prompted by a criminal investigative motive." (*U.S. v. Irving* (2d Cir. 2006) 452 F.3d 110, 123.)

We do not suggest that there are no circumstances under which the search of a passenger cabin at the border might be deemed nonroutine. (See *Flores-Montano, supra*, 541 U.S. at pp. 154–155, fn. 2 ["[w]e again leave open the question 'whether, and under what circumstances, a border search might be deemed "unreasonable" because of the particularly offensive manner [in which] it is carried out,' " quoting *United States v. Ramsey, supra*, 431 U.S. at p. 618, fn. 13].) This, however, is not such a case.

---

[6] "The individual traveler determines the time and place of the search by his own actions, and he thus has ample opportunity to diminish the impact of that search by limiting the nature and character of the effects which he brings with him." (5 LaFave, Search and Seizure, *supra*, § 10.5(a), p. 195.)

## DISPOSITION

The order denying the defendant's motion to suppress is affirmed.

Flier, J., and Egerton, J.,[*] concurred.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.