**UNITED STATES of America,
Plaintiff,**

v.

**Mark Reginald BROWN, Defendant.**

**Crim.No. 02232004.**

United States District Court,
S.D. Florida.

Jan. 24, 2004.

Melanie Allen, Assistant United States Attorney, United States Attorneys Office, Miami, FL, for Plaintiff.

Celeste Higgins, Assistant Federal Public Defender, Federal Public Defenders Office, Miami, FL, for Defendant.

## ORDER

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant Mark Reginald Brown's Motion to Suppress Evidence (DE # 20).

Brown brings this motion to suppress the approximately five kilograms of cocaine seized by United States Immigration and Customs Enforcement agents (the "agents") on August 8, 2003 inside his cabin on the cruise ship M/V Century. Brown argues that the search of his cruise ship cabin violated his Fourth Amendment protection against unreasonable search and seizure. The Government counters that the search was a routine border search that did not require a warrant or reasonable suspicion, the appropriate standard for nonroutine border searches.

The facts stated herein are gathered from the record and testimony heard at a January 20, 2004 hearing on this motion. On August 1, 2003, Brown traveled from Toronto, Canada to Ft. Lauderdale, Florida, having made his air and cruise reservations just days earlier. Ann–Marie Campbell accompanied Brown on the cruise.

Agents began surveillance of Brown and Campbell in Port Everglades, Florida when they checked in and boarded the ship on August 2, 2003. The agents selected Brown and Campbell for surveillance based on a review of passenger information, including the proximity of Brown's reservations to his travel dates and travel history to Curacao, a popular destination for acquiring drugs to smuggle into the United States. The agents again surveilled Brown and Campbell when the ship returned to Key West on August 8, 2003, after stopping in Jamaica, the Cayman Islands and Mexico. Although the ship arrived in Key West in the early morning, Brown and Campbell did not disembark until approximately 12:30 p.m.

While Brown and Campbell walked around Key West, Customs Agent Kenneth Brett ran his trained canine through the ship's hallways, targeting, among several others, the hallway in which Brown's cabin was located. The canine alerted the agent to the presence of narcotic odor outside of Brown's cabin. Based on the canine's alert, the agents, with the assistance of the ship's security chief, entered the cabin with the dog, which affirmatively responded to narcotic odor inside two pieces of luggage. The agents then initiated surveillance of the cabin and waited for Brown and Campbell. After locating them and searching the luggage, the agents discovered the cocaine.

Among the exceptions to the Fourth Amendment's prohibition on warrantless searches and seizures is the border search doctrine. "Under this doctrine, a governmental officer at the international border may conduct routine stops and searches without a warrant or probable cause because the United States as a sovereign state has the right to control what persons or property crosses its international borders." *United States v. Cardenas*, 9 F.3d 1139, 1147–48 (5th Cir.1993) (citing *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)). These searches may also occur at the "functional equivalent" of the border. The first port at which a ship docks upon sailing directly from a foreign country is the functional equivalent of the border. *Id.* at 1148; *see also United States v. Hill*, 939 F.2d 934, 936–37 (11th Cir.1991); *United States v. Prince*, 491 F.2d 655, 659 (5th Cir.1974)[1]. Here, because Key West was the first port where the ship docked upon reentering the United States, the port served as the "functional equivalent" of the border. *Cardenas*, 9 F.3d at 1147–48.

The search of the cruise ship and Brown's cabin amounted to a routine border search.[2] Customs agents credibly testified that inspectors routinely utilize trained canines to detect narcotic odor from the hallways of newly-arrived cruise

---

1. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

2. The Eleventh Circuit has not addressed: (1) whether the search of a cruise ship cabin in this instance is a routine border search; and (2) if nonroutine, what level of suspicion is required to conduct such a search. However, as discussed below, even if the entry into and search of Brown's cabin was not a routine

border search, the use of a trained canine in the cruise ship's hallways was routine. Thus, the entry into and search of the cabin was supported by, *inter alia*, the canine's reaction in the hallway outside Brown's cabin, giving rise to reasonable suspicion; indeed, the dog's alert to Agent Brett established *probable cause* to enter and search the cabin. *United States v. Dunkley*, 911 F.2d 522, 527 (11th Cir.1990) (per curiam) (finding probable cause based on trained canine's alert to drugs).

ships in Key West. The search of Brown's cabin possessed no characteristics to distinguish it from a routine border search.

Brown seems to suggest that the use of the canine in the cruise ship hallway and the subsequent search became nonroutine because the agents targeted Brown, along with other passengers, for surveillance at the cruise's commencement and when it docked in Key West. That finding, however, penalizes the government for lawfully gathering strong evidence and efficiently using its law enforcement resources. Holding that the search was nonroutine would discourage identification and diligent investigation of those individuals most likely to infest the country with illegal substances brought in from outside the border. The Court declines to suggest to the government that it should, in effect, skip out on doing its homework.

 Even absent a finding that a routine border search occurred, once aboard the ship,[3] the agents had reasonable suspicion to enter and search Brown's cabin and its contents, which is generally all that is required to satisfy the Fourth Amendment in the context of nonroutine searches at the border.[4] *United States v. Montoya de Hernandez,* 473 U.S. 531, 544, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (holding that reasonable suspicion justified detention at border of individual suspected of smuggling narcotics by swallowing balloons); *Brent v. Ashley,* 247 F.3d 1294, 1300 (11th Cir.2001) (reasonable suspicion appropriate standard to apply to detention of traveler at border beyond scope of routine customs search). Reasonable suspicion

consists of 'some minimal level of objective justification' that consists of 'more than an inchoate or unparticularized suspicion or hunch,' *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotations omitted), and requires an objective basis for suspecting the individual of smuggling. *Brent,* 247 F.3d at 1300. The level of suspicion is less than is required for probable cause. *United States v. Smith,* 273 F.3d 629, 633–34 (5th Cir.2001).

Here, several facts uncovered by the agents created a reasonable suspicion that Brown was involved in drug smuggling. First, Brown made his air and cruise reservations only days before the cruise. Brown had previously traveled to Curacao, a popular destination for drug smugglers. Agents observing Brown and Campbell checking in and boarding the cruise at its departure on August 2, 2003 noted that the couple stood out, as Brown had no interaction with Campbell, was not involved in the check-in process and appeared nervous. Upon arrival in Key West, Brown and Campbell stayed on the ship for several hours before disembarking. There, Brown was again conspicuous, as he dressed in long-sleeved clothing on an August day in Key West and showed no interest in the city's attractions; rather, he and Campbell simply walked around the area while Brown talked on two cellular telephones. On the cruise ship, their credit account listed charges of less than $200 for week-long cruise. Senior Customs Inspector Jamie Cordero, testified that this relatively low spending was consistent with the profile of a drug smuggler.[5] Lastly, Agent

---

**3.** The agents were further authorized to board the ship by 19 U.S.C. § 1581, which permits customs officers to "go on board of any vessel . . . at any place in the United States or within customs waters . . . and examine, inspect, and search the vessel and every part thereof and

any person, trunk, package or cargo on board . . . ."

**4.** Although redundant, the evidence rose to the level of probable cause. *See supra* note 2.

**5.** Inspector Cordero testified that, based on her extensive experience in the field, an aver-

Brett's canine, trained in detecting narcotic odor, alerted the authorities to the presence of narcotic odor from the hallway outside of Brown's cabin.

Taken together, these factors provided the agents reasonable suspicion to enter and search Brown's cabin. *Sokolow*, 490 U.S. at 9, 109 S.Ct. 1581.

UPON CONSIDERATION of the motion, response, evidence and arguments presented at the hearing and pertinent portions of the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that Defendant's Motion to Suppress Evidence (DE # 20) is DENIED.

age couple on a cruise spends roughly $200 per day.