

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-4-2008

# USA v. Whitted

Precedential or Non-Precedential: Precedential

Docket No. 06-3271

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Whitted" (2008). *2008 Decisions.* Paper 460.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/460

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-3271

UNITED STATES OF AMERICA

v.

JAMES WHITTED,
                              Appellant

Appeal from the District Court
of the Virgin Islands
(USVI Criminal No.04-cr-00176)
District Judge:  Honorable Raymond L. Finch

Argued May 5, 2008

Before:  RENDELL, FUENTES and CHAGARES,
Circuit Judges.

(Filed: September 4, 2008)

David J. Cattie, Esq.　**(ARGUED)**
Ogletree, Deakins, Nash, Smoak & Stewart
1336 Beltjen Road, Suite 201
Charlotte Amalie, St Thomas
USVI, 00802
　　*Counsel for Appellant*
　　　*James Whitted*

Kim L. Chisholm, Esq.　**(ARGUED)**
Office of United States Attorney
U.S. Courthouse
5500 Veterans Building, Suite 260
Charlotte Amalie, St. Thomas
USVI, 00802-6924
　　*Counsel for Appellant*
　　　*United States of America*

---

OPINION OF THE COURT

---

RENDELL, *Circuit Judge*.

James Edward Whitted appeals his conviction by jury for possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and

2

importation of a controlled substance into the United States in violation of 21 U.S.C. §§ 952(a) and 960(b)(1)(A). He claims that the District Court's failure to suppress evidence found by customs officers during a border search of his cruise ship cabin was error and merits reversal of his conviction.

In order to resolve this appeal, we must answer a question of first impression: whether the Fourth Amendment requires any level of suspicion to justify a border search of a passenger cabin aboard a cruise liner arriving in the United States from a foreign port. For the reasons that follow, we believe that it does and that reasonable suspicion is the appropriate standard. In the present case, we conclude the reasonable suspicion standard is satisfied and, accordingly, will affirm Whitted's conviction.

## I. Facts and Procedural History

On the morning of September 25, 2004, the Adventure of the Seas cruise ship, which can carry up to 3,838 passengers and 1,185 crew, arrived from the foreign port of St. Maarten and docked in St. Thomas, United States Virgin Islands. Prior to the ship's arrival, United States Customs and Border Protection officers gathered to prepare to board the ship and conduct enforcement actions. Canine Enforcement Officer Ralph Dasant was on duty that morning, and, after retrieving his drug-sniffing dog from its kennel, he used the Treasury Enforcement Communications System ("TECS"), a computerized database,

3

to access the list of vessels arriving from a foreign port. He then used the database to access the manifest of crew and passengers aboard the Adventure of the Seas. Based on TECS information generated through this search, he selected approximately ten of the ship's staterooms (out of a total of 1,557) to be looked at upon boarding the ship.

As is relevant here, TECS showed a "one-day lookout" for James Edward Whitted. App. 45. Dasant explained that a "lookout" was "a message that comes down in reference to either a crew member or a passenger on board a vessel, where we may have to take a look at that individual, being that it could be for drugs, it could be for a warrant or something of that nature." App. 45-46. Based on the one-day lookout, Dasant conducted further inquiries in TECS and discovered that Whitted's ticket had been purchased at the last minute. The system also indicated that Whitted had traveled to other drug source countries in the Caribbean and South America, including Colombia, Venezuela, and St. Maarten, and had a criminal record. Based on this information from the TECS database, Whitted's cabin was chosen for inspection.

A team of customs officers, including Dasant and the drug-sniffing dog, boarded the ship and proceeded directly to the chief of security of the ship. Together, they went to the deck of the ship where Whitted's cabin was located. After the officers knocked on the door to the cabin and ascertained that Whitted was not there, the chief of security unlocked the door

4

and the officers began to prepare the room for canine screening.[1] The dog did not alert in the hallway or at the door to the cabin. However, immediately after the cabin was prepped, the dog bolted into the room without being given a command and alerted to a bag. Dasant called him off and indicated the bag to the other officers. Customs officers Gail Fraser and Norman Ramirez then entered the room and searched through the bag, where they found "ladies' shoes, men's sandals, perfume bottles and a shaving cream container." App. 91. After ascertaining from the chief of security that no woman was assigned to the room and noting that the shaving cream container seemed strange, they set aside those items found in the bag for further examination. The chief of security offered them the use of the ship's x-ray machine. While x-raying the items, officers Fraser and Gloria Lambert noticed what appeared to be "pebbles" inside.

In the interim, Whitted returned to the cabin. Officer Ramirez took an oral declaration from Whitted, asking if he stayed in that cabin, whether the bags in the cabin belonged to him, and if any other passenger shared the cabin; Whitted acknowledged that it was his cabin and bag and that he was

---

[1] These preparations consisted of ensuring that no sharp objects, food, or anything else that might harm or distract the dog were in the cabin, moving bags from under the bed into the center of the room, and pressing the surface of the bags to expel any air inside. No bags were opened at this time.

traveling alone. After Fraser and Lambert returned from the x-ray machine, the officers entered the cabin with Whitted. Special Agent Louis Penn, Jr. subsequently arrived, and he and the customs officers probed the "pebbles" and discovered a white, powdery substance, which field-tested positive for heroin. Whitted was arrested and later charged with possession with intent to distribute a controlled substance and importation of a controlled substance into the United States.

Before trial, Whitted moved to suppress the drugs seized from his cruise ship cabin. Dasant, Lambert, and Penn testified at the suppression hearing before the District Court. In addition to the facts recounted above, Penn testified that, following Whitted's arrest, he had confirmed that Whitted had two prior convictions in North Carolina for heroin possession and sale. He also stated that he had verified the reason for the TECS lookout with San Juan officials and they had placed the lookout on TECS based on an outbound survey of Whitted in San Juan and his last-minute purchase of the ticket for cruise ship travel.

At the hearing, the parties made substantially the same arguments they do now. Whitted argued that he had a high expectation of privacy in the ship cabin, as his dwelling, such that the customs officers were required to have reasonable suspicion in order to search it. Here, he claimed, the facts available were insufficient to create reasonable suspicion that he was involved in criminal activity. The government contended that the search was a "routine" border search, focusing on the

6

fact that it was performed regularly by customs officers rather than on its intrusiveness or the privacy interest at stake. In the alternative, it urged, the TECS information established reasonable suspicion.

On October 17, 2005, assuming, without deciding, that reasonable suspicion was required for the search of Whitted's cabin, the District Court found the facts as a whole provided reasonable suspicion and, therefore, denied Whitted's motion to suppress. The case then proceeded to trial and conviction on both counts. Whitted now appeals his conviction on the grounds that the District Court improperly denied his motion to suppress.

We have jurisdiction over Whitted's appeal pursuant to 28 U.S.C. § 1291. We review the denial of a motion to suppress for clear error as to the factual findings and exercise plenary review over the application of law to those facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

## II. Discussion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Whether a search is reasonable will depend upon its nature and all of the circumstances surrounding it, *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985), but, as a

general matter, warrantless searches are unreasonable. *See Cady v. Dombrowski*, 413 U.S. 433, 439 (1973).

Searches conducted at the nation's borders, however, represent a well-established and long-standing exception to the warrant requirement. *United States v. Ramsey*, 431 U.S. 606, 619 (1977); *see also United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004). The exception applies not only at the physical boundaries of the United States, but also at the "the functional equivalent" of a border, *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973), including the first port where a ship docks after arriving from a foreign country, *United States v. Smith*, 273 F.3d 629, 633 n.8 (5th Cir. 2001). The search here, conducted as the Adventure of the Seas arrived in St. Thomas from St. Maarten, was therefore a border search.

Provided that a border search is routine, it may be conducted, not just without a warrant, but without probable cause, reasonable suspicion, or any suspicion of wrongdoing. *Montoya de Hernandez*, 473 U.S. at 538; *see also United States v. Glasser*, 750 F.2d 1197, 1201 (3d Cir. 1985). This is because the expectation of privacy is "less at the border than in the interior" and "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is . . . struck much more favorably to the Government." *United States v. Hyde*, 37 F.3d 116, 119-20 (3d Cir. 1994). Even at the border, however, an individual is

8

entitled to be free from unreasonable search and seizure and his or her privacy interests must be balanced against the sovereign's interests. *Id.* Consequently, certain searches, classified as "nonroutine," require reasonable suspicion of wrongdoing to pass constitutional muster. *Montoya de Hernandez*, 473 U.S. at 541. Border searches thus fall into two categories: "routine searches that require no suspicion and nonroutine searches that require reasonable suspicion." *United States v. Bradley*, 299 F.3d 197, 204 n.4 (3d Cir. 2002).

The question here, therefore, is not whether the customs officers were required to have a warrant or probable cause in order to search Whitted's private cabin, but, rather, whether reasonable suspicion was necessary. The parties agree that no suspicion is required in order for a customs officer to board and search the cruise ship as part of a routine border search. They disagree, however, as to whether any Fourth Amendment protection applies to a search of a private sleeping cabin aboard a cruise ship.

To answer this question, we must first decide whether the border search at issue was routine or non-routine and, so doing, set forth the correct standard required under the Fourth Amendment. We will then turn to a determination of whether this search was conducted in accordance with it.

9

**A. Reasonable Suspicion and the Search of a Passenger Cabin of a Cruise Ship**

To ascertain whether a border search can be classified as routine, we must examine the degree to which it intrudes on a traveler's privacy. *Bradley*, 299 F.3d at 204. As the Supreme Court has held, "highly intrusive searches of the person" that implicate the "dignity and privacy interests of the person being searched" require reasonable suspicion. *Flores-Montano*, 541 U.S. at 152. Courts have focused on the privacy interest and the intrusiveness and indignity of the search to distinguish between routine and nonroutine searches. *See United State v. Cardenas*, 9 F.3d 1139, 1148 n.3 (5th Cir. 1993) (observing that "lower courts have generally classified routine searches as those which do not seriously invade a traveler's privacy"); *United State v. Vega-Barvo*, 729 F.2d 1341, 1344-46 (11th Cir. 1984) (evaluating intrusiveness and indignity of the search). Accordingly, patdowns, frisks, luggage searches, and automobile searches, involving neither a high expectation of privacy nor a seriously invasive search, are routine,[2] whereas body cavity searches, strip searches, and x-ray examinations are considered nonroutine by virtue of their significant intrusion on

---

[2] *See Bradley*, 299 F.3d at 203 (patdowns); *United States v. Gonzalez-Rincon*, 36 F.3d 859, 864 (9th Cir. 1994) (luggage searches and patdowns); *Flores-Montano*, 541 U.S. at 155 (vehicle).

an individual's privacy.[3]

In the present case, Whitted argues that the search of a cruise ship cabin is not a routine border search because the Fourth Amendment's primary purpose is the protection of privacy in one's home and the search of one's home, by its nature, is highly intrusive. He makes a compelling argument that an individual's expectation of privacy in a cabin of a ship is no different from any other temporary place of abode. Because the search of his living quarters aboard the cruise ship intruded upon that most private of places–his home–he says it should be considered non-routine. In response to Whitted's arguments, the government contends that the search of the cabin was a routine border search and "submits that the border search of . . . Whitted's cabin should be analyzed in the same way as that of a vehicle, as opposed to a person." Appellee's Br. 10 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976)).

Neither this Court nor the Supreme Court has addressed the issue of whether the search of a cabin of a cruise ship sufficiently intrudes upon an individual's privacy to render it non-routine, so that reasonable suspicion of criminal activity is required. Indeed, there is a surprising dearth of authority on the

---

[3] *See Montoya de Hernandez*, 473 U.S. at 541 (alimentary canal search); *Vega-Barvo*, 729 F.2d at 1349 x-rays); *United States v. Adekunle*, 980 F.2d 985, 987-88 (5th Cir. 1992) (strip search).

11

matter.

The only authority which the government cites for the proposition that the search of a passenger's cruise ship cabin amounts to a routine border search is readily distinguishable from the present case. *See United States v. Brown*, 298 F. Supp. 2d 1317 (S.D. Fla. 2004). In *Brown*, the "routine" aspect of the search was the use of "trained canines to detect narcotic odor from the hallways of newly-arrived cruise ships in Key West." 298 F. Supp. 2d at 1320. The search of Brown's cabin occurred only after the drug-sniffing dog had alerted to the presence of drugs in the cabin while still in the hallway.[4] While the court stated that the search was not distinguishable from a routine border search, clearly it was referring to the use of the dogs to "search" the ship's hallways, not the search of the cabin once there was reasonable suspicion. *Id*. at 1320 & n.2.

Existing caselaw counsels in favor of the approach urged by Whitted. In the case most clearly on point, the United States Court of Appeals for the Ninth Circuit concluded that "the

---

[4] Here, by contrast, the dog did not alert until after the cabin was opened and prepared for inspection. The dog's alerting in Whitted's case, therefore, cannot establish reasonable suspicion for the search. The routine search in *Brown*, done without reasonable suspicion, was of the ship's hallways–public space; the search of Brown's cabin was done only after there was reasonable suspicion (or even probable cause) to search.

12

search of private living quarters on a ship should require something more than naked suspicion." *United States v. Alfonso*, 759 F.2d 728, 738 (9th Cir. 1985). There, the customs officers had searched a cabin on a ship which had arrived from Colombia. The defendant argued that "even if the search [were] deemed a proper border search, the search of his private living quarters on the ship was unreasonable under the Fourth Amendment." *Id*. at 733. Although the court found no cases that were directly on point,[5] it reasoned that "[o]bviously, a search of the private living quarters of a ship is more intrusive than a search of other areas. . . . The private living quarters are at least analogous to a private dwelling." *Id*. at 737-38. It then went on to conclude that the information known to the officers provided reasonable suspicion to justify the search. *Id*. at 738.

Other courts have reached similar conclusions. *See State v. Logo*, 798 So.2d 1182 (La. App. 4 Cir. 2001) (holding that customs officers need reasonable suspicion to conduct a border search of the cabin of a passenger on a cruise ship). At least one United States district court has also required reasonable suspicion. *United States v. Cunningham*, No. 98-265, 1996 WL 665747 (E.D. La. Nov. 15, 1996). In that case, as here, a customs agent searched a passenger's cabin without consent, a

---

[5] 759 F.2d at 737 (citing *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (en banc), and *United States v. Piner*, 608 F.2d 358, 361-64 (9th Cir. 1979) (Kennedy, J., dissenting)).

warrant, or probable cause. A drug dog alerted to the presence of drugs in the cabin and items in the room were subsequently found to contain drugs. The court stated that "with respect to searches of private areas of the vessel's holds conducted for the purpose of discovering contraband, the Fourth Amendment requires reasonable suspicion, rather than probable cause as the appropriate standard by which to judge the search's lawfulness." *Id*. at *3 (citing *Williams*, 617 F.2d at 1087-88).

Those courts to consider searches at sea[6] have also uniformly recognized a greater expectation of privacy in private dwelling areas of a ship than that in public areas.[7] These cases

---

[6] Although the authority to inspect at sea is more limited than that of customs officers at the border, the reasoning in the cases is helpful to an analysis of an individual's expectation of privacy in sleeping quarters aboard a ship. *See United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (noting that searches of vessels by customs officials are most analogous to border searches).

[7]*United States v. Eagon*, 707 F.2d 362, 366 (9th Cir. 1982) (Boochever, J., concurring) (reasoning that when evaluating a Coast Guard investigatory stop, "[w]e should . . . look to the scope of the boarding activity under the particular circumstances involved. Those living on their boats have a greater expectation of privacy at night. . . . The boarding in this case, however, involved no invasion of sleeping quarters."); *United States v. Streifel*, 665 F.2d 414, 423 (2d Cir. 1981) (stating that, in the context of the scope of searches of a ship, "one has a more has

routinely differentiate between those areas of a ship in which little or no privacy can be expected and an individual's living and sleeping quarters.[8]  We similarly have suggested that a

a more legitimate expectation of privacy in one's living quarters than in other areas"); *Williams*, 617 F.2d at 1092-93 (Roney, J., concurring) (observing that constitutional protection against unreasonable search and seizure "extends only to the areas in which he has a legitimate expectation of privacy, including his person, his cabin and his personal effects"); *Piner*, 608 F.2d at 364 (Kennedy, J., dissenting) (saying "search of certain portions of a vessel, such as the crew's quarters on an ocean-going tanker or a locked compartment on the bridge, may constitute substantial invasions of privacy"); *see also Warrantless Searches and Seizures*, 37 GEO. L.J. ANN. REV. CRIM. PROC. 39, 115 (2008) ("Because there is a reasonable expectation of privacy in nonpublic areas of the vessel to which common access is limited, warrantless searches that extend beyond the scope of document and safety inspections require either reasonable suspicion of criminal activity or probable cause, depending on the intrusiveness of the search.").

[8]*United States v. Cardona-Sandoval*, 6 F.3d 15, 21-23 (1st Cir. 1993) (noting that, on a cruise vessel, "an individual's private space can meaningfully be distinguished from areas that are public or common" and courts "should distinguish among areas, treating some as not susceptible to a reasonable expectation of privacy by a crew member"); *United States v. Lopez*, 761 F.2d 632, 635-36 (11th Cir. 1985) (gathering cases and noting ship crew's expectation of privacy in living and

15

sleeper compartment in a train might give rise to a higher expectation of privacy than can be expected in more public or common areas of the train. *United States v. Kim*, 27 F.3d 947, 953 (3d Cir. 1994).

We believe that these courts correctly recognize that the search of private living quarters aboard a ship at the functional equivalent of a border is a nonroutine border search and must be supported by reasonable suspicion of criminal conduct. The cruise ship cabin is both living quarters and located at the national border. As a result, one principle underlying the caselaw on border searches–namely, that "a port of entry is not a traveler's home," *United States v. Thirty-Seven Photographs*, 402 U.S. 363 (1971)–runs headlong into the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic," foremost in our nation's Fourth Amendment jurisprudence, *Payton v. New York*, 445 U.S. 573, 601 (1980) (quoting *United States v. Watson*, 423 U.S. 411, 429 (1976) (Powell, J., concurring)). We find that requiring reasonable suspicion strikes the proper balance

---

sleeping quarters); *see also* Comment, *The Preservation of Privacy Interests at Sea: The Need for Meaningful Scope Limits on Custom Official and the Coast Guard's Sweeping Authority to Search Vessels*, 29 TUL. MAR. L.J. 105, 113-117 (2004) (observing that courts distinguish between public and private areas of a ship in evaluating the expectation of privacy and the permissibility of a search).

16

between the interests of the government and the privacy rights of the individual.  It also best comports with the case law, which treats border searches permissively but gives special protection to an individual's dwelling place, however temporary.  We, therefore, join those courts that require reasonable suspicion to search of a passenger cabin aboard a ship.

As an initial matter, we have little trouble concluding that a passenger cabin is more like an individual's home than an automobile.  Whereas the "dignity and privacy interests of the person" do not carry over to border searches of an automobile, *Flores-Montano*, 541 U.S. at 152, the privacy interests of an individual in his or her living quarters are significantly greater and compel more rigorous Fourth Amendment protection.  The sanctity of private dwellings, whether temporary or permanent, ordinarily gives rise to "the most stringent Fourth Amendment protection." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976); *see also Minnesota v. Carter*, 525 U.S. 83, 89 (1998) (acknowledging that "in some circumstances a person may have a legitimate expectation of privacy in the house of someone else"); *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990) (holding that overnight guests in the house of someone else have a reasonable expectation of privacy); *Stoner v. California*, 376 U.S. 483, 490 (1964) (hotel room); *McDonald v. United States*, 335 U.S. 451 (1946) (living quarters in rooming house).  We believe that "one's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's

17

residence," *Martinez-Fuerte*, 428 U.S. at 561, even where one's residence is aboard a ship.

Individuals have a reasonable and high expectation of privacy in their living and sleeping quarters aboard ships, even at national borders, which merits Fourth Amendment protection. As a passenger of a cruise liner, Whitted had a reasonable expectation of privacy in his cabin: he excluded others from it, used it as his home, and slept and conducted his daily life therein. This expectation was eminently reasonable from an objective standpoint. As the Supreme Court has recognized,

> [w]e are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend.

*Olson*, 495 U.S. at 98-99. Just as individuals seek privacy in hotel rooms or another's home to sleep, cruise ship passengers seek out privacy in their sleeping cabins and expect that they will not be opened or intruded upon without consent.

Mindful of the "centuries-old principle of respect for the privacy of the home," we, therefore, consider a search of a

18

individual's living quarters among the most intrusive of searches–invading as it does a place where the individual expects not to be disturbed. *Wilson v. Layne*, 526 U.S. 603, 610 (1999); *see also Georgia v. Randolph*, 547 U.S. 103, 115 (2006); *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). Here, the search was highly intrusive on the defendant's privacy. Uninvited and in Whitted's absence, the officers entered his *de facto* home, searched through his belongings, and subjected his private space to inspection by a drug-sniffing dog.

Because of the high expectation of privacy and level of intrusiveness, the search cannot be considered "routine" and must therefore be supported by reasonable suspicion of illegal activity. Reasonable suspicion is not a high standard that will prevent customs officers from detecting drug smugglers at our borders. Rather, it sets a relatively low threshold that will continue to permit the kind of cabin searches customs officers currently conduct.[9]

**B. Reasonable Suspicion Existed to Search the Defendant's Cabin**

---

[9] Customs officers can also search the bags and persons of cruise ship passengers as they pass through customs inspection at the border.

19

Under the reasonable suspicion standard, customs officers are required to have a "particularized and objective basis" to suspect illegal activity in order to conduct a search. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The officers must be able to articulate reasons that led to the search of the cabin that are indicative of behavior in which most innocent people do not engage. *See Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir. 1995). We consider the totality of the circumstances in determining whether reasonable suspicion existed at the time of the search. *Arvizu*, 534 U.S. at 274. Accordingly, although each individual factor alone may be consistent with innocent behavior, it is sufficient if together they "serve to eliminate a substantial portion of innocent travelers. *Karnes*, 62 F.3d at 493.

In this case, numerous facts raised the suspicion that Whitted was involved in drug smuggling. The vast majority of these came from information in the TECS database. First, Whitted took a cruise that traveled to drug source countries. Second, Whitted had previously traveled to several known narcotics source countries. Third, Whitted purchased his ticket just prior to the ship's date of departure and may have paid for it in cash.[10] As other courts have recognized, most cruise

---

[10] We note that the use of cash to purchase the ticket was asserted in the government's brief regarding suppression and seems to have been assumed by both counsel and the Court during the suppression hearing. The appendix submitted to us,

20

passengers purchase tickets well in advance and with a credit instrument. *See United States v. Smith*, 273 F.3d 629, 634 (5th Cir. 2001). Fourth, Whitted had a record of felony drug convictions. Last, TECS indicated that authorities in San Juan, Puerto Rico had found Whitted's behavior suspicious and entered a lookout for him into the TECS database. This was significant because it could have indicated a warrant for his arrest or other criminal wrongdoing. It was also the impetus for querying the TECS database further and discovering other factors that raised a suspicion of drug smuggling.

The defendant argues that this information cannot establish reasonable suspicion because its source was the TECS computer database, unsubstantiated by other information. We reject this contention. As a general matter, customs officers should be able to rely on data provided by computer reports to create reasonable suspicion for a search. If they cannot, their hands would be tied until they either independently investigated the individual or contacted each source for the report to confirm its validity. Just as a customs officer is entitled to rely on unconfirmed information relayed to him by his supervisor in order to look out for and search an individual at the border, *United States v. Love*, 413 F. Supp. 1122 (S.D. Tex. 1976), so too is a customs officer permitted to rely on TECS information entered by other customs officials to create reasonable suspicion

---

however, does not contain further evidence of the method of purchase.

21

for a search.[11]

Whitted also argues that the customs officers engaged in profiling, based on a "drug smuggling profile," and cannot be said to have had reasonable suspicion. This last argument is entirely without merit. Whitted was selected for search not because of his resemblance to a smuggling profile, but because a one-day lookout specific to him had been entered into TECS. There was never any drug smuggling profile in evidence or relied on by the Court or the customs officers; the level of suspicion was based on the specific relevant facts known to the customs officers who searched Whitted's cabin.[12] As the

---

[11] Whitted claims that this information should not have been relied on as it was hearsay. Federal Rule of Evidence 104(a), however, does not preclude the consideration of hearsay evidence in a suppression hearing, and Whitted has not presented any evidence that the TECS report in this case was unreliable. By contrast to the cases cited by Whitted, this is not a situation where the report shows only very old information of dubious reliability. *See Velasquez v. United States*, No. CIV 00-0036TUCGEE, 2002 WL 32818333 (D. Ariz. Sept. 26, 2002). Nor does Whitted seriously challenge most of the information contained in the report.

[12] Had a "drug smuggling profile" been in evidence, it would not change our analysis. As the Supreme Court has stated, "[a] court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that

Supreme Court has instructed, "'the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.'" *Sokolow*, 490 U.S. at 10 (quoting *Illinois v. Gates*, 462 U.S. 213, 243-244, n.13 (1989)).

Viewed in their entirety, the facts here support the conclusion that the customs officers reasonably suspected Whitted of criminal activity. In the present case, customs officer Dasant found the information in TECS suspicious and chose to search Whitted's cabin based upon it. By drawing on his particular expertise, he evaluated the information and drew inferences that created reasonable suspicion of drug smuggling. *Arvizu*, 534 U.S. at 273 (permitting officers "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'"); *see also Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979) (observing that a trained investigator may be "able to perceive and articulate

conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent." *United States v. Sokolow*, 490 U.S. 1, 10 (1989); *see also Vega-Barvo*, 729 F.2d at 1349 (noting that, although suspects often are initially approached because they fit a profile, "[i]t is not the profile . . . but the factors which make up the profile which are crucial to whether or not there is a reasonable suspicion").

23

meaning in given conduct which would be wholly innocent to the untrained observer"). His training and three years experience as a canine enforcement officer doing similar work allowed him to draw inferences from "objective facts, meaningless to the untrained," and substantiate his suspicions. *United States v. Cortez*, 449 U.S. 411, 419 (1981); *see also Smith*, 273 F.3d at 634-35 (finding reasonable suspicion on similar facts where passengers had taken a cruise bound for a drug source country and had traveled there before, had paid in cash two weeks before the cruise, had placed a call to a shoreside number, and one had a criminal record). Accordingly, we conclude that the agents had reasonable suspicion to search Whitted's cabin and its contents, and did not run afoul of the Fourth Amendment in the context of a nonroutine search at the border.

## Conclusion

For the foregoing reasons, we will AFFIRM the denial of the motion to suppress and uphold the jury's verdict of conviction.

24

CHAGARES, <u>Circuit Judge</u>, concurring.

Although I agree with the ultimate result reached by my colleagues in this case, I write separately because I would take a different approach to reach this outcome. We all agree that, even assuming the search of James Whitted's cabin was non-routine, reasonable suspicion existed to support the search. I would affirm the District Court's refusal to suppress on this limited basis and thereby avoid the unnecessary resolution of a constitutional issue of first impression. I thus concur respectfully with the judgment of the majority.

"It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." <u>Burton v. United States</u>, 196 U.S. 283, 295 (1905). Such restraint is well-established and recognized universally. <u>See, e.g.</u>, <u>Mills v. Rogers</u>, 457 U.S. 291, 305 (1982) ("It is this Court's settled policy to avoid unnecessary decisions of constitutional issues.").

The most often-cited enunciation of this concept comes from Justice Brandeis' famous concurrence in <u>Ashwander v. Tennessee Valley Authority</u>, 297 U.S. 288 (1936), where he summarized certain prudential principle that the Supreme Court "developed . . . for its own governance in the cases confessedly within its jurisdiction . . . ." <u>Id.</u> at 346 (Brandeis, J., concurring). Under this "series of rules," the Court "has avoided passing upon a large part of all the constitutional

25

questions pressed upon it for decision." Id. One such rule was that "[t]he Court will not anticipate a question of constitutional law in advance of the necessity of deciding it . . . ." Id. (quotation marks omitted). We have recognized that this "Ashwander principle [] calls for the avoidance of ruling on federal constitutional matters in advance of the necessity of deciding them, to postpone judicial review where it would be premature."[13] Armstrong World Indus., Inc. v. Adams, 961 F.2d

---

[13]This prudential rule of constitutional interpretation is related – but not identical – to the concept of constitutional avoidance. The latter applies "[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems . . . ." Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575 (1988). In such cases, "the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Id.; see also Arizonans for Official English v. Arizona, 520 U.S. 43, 78 (1997) ("Federal courts, when confronting a challenge to the constitutionality of a federal statute, follow a 'cardinal principle': They 'will first ascertain whether a construction . . . is fairly possible' that will contain the statute within constitutional bounds.") (quoting Ashwander, 297 U.S. at 348) (Brandeis, J., concurring); United States v. Grier, 475 F.3d 556, 567 n.7 (3d Cir. 2007) (describing concept); United States v. Ali, 508 F.3d 136, 147 (3d Cir. 2007) (stating that constitutional avoidance "applies to statutory interpretation only where there is doubt whether an otherwise acceptable construction of a statute would raise serious

26

405, 413 (3d Cir. 1992) (citation omitted).

Powerful considerations, both theoretical and practical, underpin this concept.  See New Jersey Payphone Assoc. v. Town of West New York, 299 F.3d 235, 249 (3d Cir. 2002) (Alito, J., concurring) ("The rationales behind the doctrine of avoiding constitutional questions except as a last resort are grounded in fundamental constitutional principles – the great gravity and delicacy of judicial review, separation of powers, the paramount importance of constitutional adjudication, the case or controversy requirement, and principles of federalism.") (quotation marks omitted).  Just a few examples will suffice here.  First, and most simply, the rule avoids wasting scarce judicial resources.  Second, "[t]he concern that unnecessary decisions be avoided has its most important justification in the prospect that unnecessary decisions may be wrong decisions." 13 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.3 (3d ed. 2000).  Third, our adversary system requires litigants to present – as squarely as possible – the narrow and exact question to be decided.  This is because "specific facts stimulate more comprehensive and accurate adjudication than the flights of fancy.  The concrete circumstances presented by a plaintiff who has suffered actual injury may illuminate the abstract issues, and help establish the limits of the decision for future cases."  Id.  In fact, "[t]he simplest theoretical perspective on standing draws directly from

constitutional problems") (quotation marks omitted).

27

our tradition that unnecessary judicial decisions should be avoided." Id.; see also Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11-12 (2004) (observing that standing rules are consistent with the principles that commit courts to pass on constitutional questions only when necessary).

The prudential principle set forth by Justice Brandeis applies here and should control our analysis of this case. The parties do not dispute that the search of Whitted's cabin took place at a border. Therefore, the very best Whitted can hope for is that the border search here is held to be "non-routine," in which case we would examine the Government's search for reasonable suspicion. See, e.g., United States v. Montoya de Hernandez, 473 U.S. 531, 541 (1985) (holding that "detention of a traveler at the border, beyond the scope of a routine customs search and inspection," is constitutional only if supported by reasonable suspicion); United States v. Rivas, 157 F.3d 364, 367 (5th Cir. 1998) (holding that drilling into metal frame of trailer when traveler was stopped at a checkpoint was a non-routine search requiring reasonable suspicion); United States v. Mejia, 720 F.2d 1378, 1381-82 (5th Cir. 1983) (holding that abdominal x-ray of suspected drug courier required reasonable suspicion).

My colleagues and I all agree that the totality of the circumstances here did create reasonable suspicion that Whitted was engaged in narcotics smuggling. He was traveling alone on a cruise ship. That ship traveled to narcotics source countries. Whitted had purchased his single ticket in cash, shortly before

28

the ship departed.  He had two prior convictions for drug trafficking.  He had recently visited countries associated with narcotics production.  The authorities in Puerto Rico found his behavior suspicious.  All of this certainly amounts to a "particularized and objective basis" to believe Whitted might be smuggling drugs.  United States v. Arvizu, 534 U.S. 266, 273 (2002) (quotation marks omitted).  The District Court analyzed these facts correctly in denying Whitted's suppression motion.

Because we need not resolve a constitutional issue of first impression to affirm this result, I would not reach the issue. Instead, I would hold simply that, even assuming the necessity of reasonable suspicion, Whitted's appeal would fail nonetheless.

_____

29