PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 17-1519

———————————

CARLYLE BRYAN; JULIE BEBERMAN;
CHARLES FRANCIS,

Appellants

v.

UNITED STATES OF AMERICA; UNKNOWN OFFICERS OF THE DEPARTMENT
OF HOMELAND SECURITY; BUREAU OF CUSTOMS & BORDER PROTECTION;
CUSTOMS AND BORDER PROTECTION OFFICERS JOHN MAZUR;
JAMIE DEMARAIS; OBED TORRES; WILLIAM SANTIAGO;
ORLANDO BAEZ; TIMOTHY OGG; ANDRES VAZQUEZ;
JOEL OSORIO; JUAN GRACIA; GREGORY DEFELICE

———————————

Appeal from the District Court of the Virgin Islands
(Division of St. Croix)
(D.C. Civil Action No. 1-10-cv-00066)
District Judge: Honorable Wilma A. Lewis

———————————

Argued on May 22, 2018

Before: KRAUSE, ROTH and FISHER, Circuit Judges

(Opinion filed: January 18, 2019)

David M. Nissman,                    **(Argued)**
McChain Nissman Law Group
53A Company Street
Christiansted, VI 00820

            Counsel for Appellants

Samantha L. Chaifetz                    **(Argued)**
Joycelyn Hewett
Chad A. Readler
Mark B. Stern
United States Department of Justice
Appellate Section
Room 7248
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Jeffrey E. Sandberg
United States Department of Justice
Civil Division
Room 7214
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Counsel for Appellee

_____

OPINION

_____

ROTH, <u>Circuit Judge</u>

In 2008, Carlyle Bryan, Julie Beberman, and Charles Francis (the travelers), residents of St. Croix in the U.S. Virgin Islands, embarked on a Caribbean cruise aboard the Adventure of the Seas. Their trip took them to a number of foreign ports before they returned to the United States. During their trip, U.S. Customs and Border Protection (CBP) officers searched their cabins on suspicion of drug-smuggling activity. Those searches yielded no contraband and prompted the three travelers to assert *Bivens* claims[1] against the officers for allegedly violating their Fourth Amendment rights. They also asserted tort claims against the United States government under the Federal Tort Claims Act (FTCA or the Act). The District Court of the Virgin Islands granted summary judgment in favor of the officers and the government.

---

[1] *Bivens* provides for private rights of action against federal officials for certain constitutional violations. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

2

Because we conclude that the officers are entitled to qualified immunity and the United States government is shielded from liability under the FTCA's discretionary function exception, we will affirm.

I.

The Cruise

The cruise lasted from August 31 to September 7, 2008. Beberman had booked two cabins for the three travelers: one for Bryan and herself, and a second for Francis. The cruise began in the United States. They sailed from San Juan, Puerto Rico, stopped at several foreign ports, including Antigua, Barbados, St. Lucia, and St. Maarten, proceeded to St. Thomas in the U.S. Virgin Islands, and returned to San Juan.

The travelers had to pass through a CBP checkpoint in San Juan before boarding the ship. Bryan and Beberman went through without incident. Francis's trip through the checkpoint was not so smooth. When a CBP officer asked Francis what his occupation was, he hesitated and then said "oil change." (Francis worked with automobiles and changed motor oil.) CBP officers then inspected Francis's bag. There was a very full canister of shaving powder in the bag. When a CBP officer opened the canister, the powder dispersed through the room and coated the officer. Bryan laughed. They contend now that the inspection of their cabins was in retaliation for Bryan's laughing at the CBP officer. The officers found nothing unlawful in Francis's bags. CBP Officer Baez made a notation in the Treasury Enforcement Communications System (TECS) database that Francis had appeared "disoriented and nervous" and that it took him some time to state his employment, but that the examination of his bag did not uncover anything.[2]

The Creation of "Lookout" Entries by Officer Timothy Ogg (September 5, 2008)

CBP Officer Timothy Ogg, stationed in San Juan, was routinely assigned the task of reviewing passenger manifests for the Adventure of the Seas to identify passengers worthy of further scrutiny. Around September 1, he compared the names on the passenger manifest against the names on reports logged onto TECS. Both Bryan's and Francis's names yielded matches; both had TECS entries related to drug smuggling.

Officer Ogg found two entries on Bryan. The first, dated May 17, 2000, was authored by Immigration & Customs Enforcement (ICE) Agent Hillary Hodge. Referring to Bryan, the entry read: "Subject is associate[d] with suspected drug smugglers within the US Virgin Islands. Subject is also suspected of smuggling narcotics within the Virgin Islands. If encountered, conduct 100% exam . . .."[3] Officer Ogg later testified that he

---

[2] JA 8.
[3] JA 9.

3

had previously worked with Agent Hodge and credited his entry in part because he regarded Hodge as an excellent worker. The second TECS entry, from 2004, referred to the prior entry, characterized Bryan as a "suspect in USVI drug smuggling," and encouraged agents to "document [his] co-travelers, employment and reason for travel."[4]

As for Francis, Officer Ogg uncovered two TECS reports from 2006 identifying Francis as the "Subject of [a Drug Enforcement Administration] indictment." The first report was authored while the Drug Enforcement Administration investigation was going on and characterized Francis as a "subject of current interest"; the second was authored after the investigation had ended and referred to him as a "Previous Suspect."[5] Both reports urged personnel to alert special agents if they encountered Francis.

According to Officer Ogg's subsequent deposition testimony, another factor aroused his suspicion: CBP officers had previously made narcotics seizures on the Adventure of the Seas on the same route. A number of islands along the route were known to be sources of narcotics smuggled into the United States. Officer Ogg characterized them as high-risk islands.

On September 5, primarily on the strength of the TECS records concerning Bryan and Francis, Officer Ogg created "lookout" entries for Bryan and Francis in the TECS database. A "lookout" is a TECS entry that alerts CBP officers to specific passengers and recommends certain investigative steps when they are encountered. In the case of Bryan and Francis, the "lookout entries" noted their connection to "drug smuggling" and recommended, in the standard TECS shorthand (*i.e.,* "100% exam"), that their cabins be inspected before their return to San Juan on September 7.[6]

Officer Ogg also entered a separate "lookout" for Beberman. Except for the co-travelers listed, the "lookout" entry for Beberman mirrored Bryan's. At his deposition, Officer Ogg gave two reasons for the Beberman "lookout." First, she was traveling with two individuals about whom there were independent TECS entries predicated on drug-smuggling concerns. Second, as a practical matter, Officer Ogg stated that he had to enter a lookout for Beberman to ensure that Bryan and Francis did not use her to evade

---

[4] JA 9-10.

[5] JA 10.

[6] *Id.*

4

detection and inspection by having her submit a single customs declaration form for the three of them, but in her name only.[7]

The St. Thomas Cabin Searches (September 6, 2008)

On the morning of September 6, 2008, after the travelers had returned to United States waters and had docked in St. Thomas, CBP Officers DeFelice, Demarais, Mazur, Santiago, and Torres (collectively, the St. Thomas Officers) inspected Bryan and Beberman's cabin, along with Francis's.

The cabin searches each lasted between five and ten minutes.[8] The St. Thomas officers knocked on the cabin doors before opening them. The occupants were asked to get dressed without using the bathroom, and in at least partial view of the officers. They were then asked to leave their cabins and stand against a wall in the hallway. They waited in the hallway for between two and five minutes, while officers with a drug-sniffing dog inspected their cabins. Neither cabin search yielded any contraband; the St. Thomas Officers created TECS entries to that effect.[9]

II.

As a result of the searches, Beberman, Bryan, and Francis filed suit in the District Court for the Virgin Islands, asserting Fourth Amendment *Bivens* claims against Officer Ogg, who had recommended, but not participated in, the cabin searches and against the St. Thomas officers, who had executed the cabin searches. The travelers also asserted tort claims against the United States under the FTCA for invasion of privacy, false imprisonment, and intentional infliction of emotional distress.

---

[7] Ogg testified at his deposition that passengers traveling together were allowed to submit a single customs declaration form without identifying every passenger. Because secondary inspections were triggered by the names included on declaration forms, Bryan and Francis could have attempted to evade detection by having Beberman submit a form in her name only. Officer Ogg explained that he had entered three separate "lookouts" to guard against that possibility.

[8] The cabin inspections differed in two respects: The occupants found themselves in different states of undress (*i.e.*, Francis was naked, while Bryan and Beberman were partially clothed) and the occupants were observed to different extents while they dressed (*i.e.*, Bryan and Beberman dressed with their cabin door ajar and the officers outside, while Francis dressed in full view of the officers).

[9] On September 7, when the ship reached San Juan, a different set of CBP officers began to inspect the travelers' cabins but cut short the searches when they learned of the St. Thomas searches. The San Juan searches are not implicated in this appeal. The travelers voluntarily dismissed their *Bivens* claims against the San Juan officers.

5

At the close of discovery, the officers and the United States moved for summary judgment. The District Court granted their motion on all claims.

As for the officers, the District Court reasoned that neither Officer Ogg's entry of "lookouts" nor the St. Thomas cabin searches violated the travelers' Fourth Amendment rights. Further, it held that the officers were entitled to qualified immunity because their conduct did not violate clearly established Fourth Amendment rights.

As for the United States, the District Court held that the FTCA claims were barred by the Act's discretionary function exception.

We review the District Court's grant of summary judgment *de novo*, applying the same decisional principle.[10] The District Court exercised subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346(b). We have appellate jurisdiction under 28 U.S.C. § 1291.

III.

The Fourth Amendment protects the public "against unreasonable searches and seizures."[11] Whether a search is reasonable turns on "all of the circumstances surrounding the search," including where the search took place.[12]

The search here took place at the border. The border serves a unique gate-keeping function. Our controlling Fourth Amendment precedent is attuned to that reality. The Supreme Court has stressed the border's role in protecting our territorial sovereignty, along with the need to curb the inflow of drugs at the border.[13] For those reasons, we extend the government special latitude at the border and strike "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual" in the government's favor.[14]

---

[10] Summary judgment should be granted when, "after drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

[11] U.S. Const. amend. IV.

[12] *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).

[13] *See Montoya*, 473 U.S. at 538 (highlighting a "longstanding concern for the protection of the integrity of the border. This concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics . . ..") (citation omitted); *see also Bradley v. United States*, 299 F.3d 197, 201-02 (3d Cir. 2002).

[14] *Montoya*, 473 U.S. at 539-40; *see also United States v. Hyde*, 37 F.3d 116, 119-20 (3d Cir. 1994).

In view of the government's interests, we "have long held that routine searches at our nation's borders are presumed to be reasonable under the Fourth Amendment."[15] Indeed, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . .."[16] In contrast, "nonroutine searches . . . require reasonable suspicion."[17] This approach to border searches applies with equal force at "the functional equivalent" of the border,[18] such as a ship's first port of call in the United States.[19] Under this standard, the search here was a border search.

On September 4, 2008, a day before Officer Ogg entered "lookouts" for the travelers and two days before the cabin searches, we ruled for the first time on the constitutional propriety of border searches in the same context presented in this appeal— in remarkable coincidence, searches of cabins aboard the Adventure of the Seas.[20] In *United States v. Whitted*, we acknowledged "the surprising dearth of authority" on whether a search of a cruise ship cabin at the border is a routine search requiring no suspicion, or a non-routine search requiring "reasonable suspicion" (*i.e.*, a "particularized and objective basis" to suspect criminal activity).[21] We held for the first time that because of a passenger's "high expectation of privacy" and the "level of intrusiveness," a search of a cruise ship cabin at the border is non-routine and requires reasonable suspicion.[22] We also held that unsubstantiated information from TECS can establish reasonable suspicion.[23]

IV.

In considering whether a government official is entitled to qualified immunity, a court can determine whether a constitutional right was violated or in the alternative, whether that right was clearly established.[24] Following that precedent, we will not opine as to whether there were underlying Fourth Amendment violations involved in the search here. We will instead determine whether the *Whitted* standard, that a search of a cabin on a cruise ship required reasonable suspicion, was clearly established when Officer Ogg included in his entry of "lookouts" in the TECS System that 100 % examination of the

---

[15] *Bradley*, 299 F.3d at 201 (citations omitted).

[16] *Montoya*, 473 U.S. at 538 (footnote omitted).

[17] *Bradley*, 299 F.3d at 204 n.8 (citation omitted).

[18] *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973).

[19] *United States v. Smith*, 273 F.3d 629, 633 n.8 (5th Cir. 2001) (citation omitted).

[20] *United States v. Whitted*, 541 F.3d 480 (3d Cir. 2008).

[21] *Whitted*, 541 F.3d at 486, 489.

[22] *Id.* at 489.

[23] *Id.* at 490.

[24] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

three travelers, *i.e.*, examination of their cabins, was recommended and the next day when the St. Thomas officers searched the travelers' cabins.

The doctrine of qualified immunity shields government officials from *Bivens* claims and money damages, unless a plaintiff can establish that the official violated a statutory or constitutional right, and that the right was "clearly established at the time of the challenged conduct."[25] To be clearly established, a right's contours must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it" and that "existing precedent . . . placed the statutory or constitutional question confronted by the official beyond debate."[26]

Further, as the Supreme Court recently reiterated, "clearly established law should not be defined at a high level of generality" but must instead "be particularized to the facts of the case."[27] The doctrine is designed to "give[] government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law."[28]

Supreme Court discussion of searches has emphasized the threats posed at borders and the government's compelling interests in searches there.[29] Because the government's interest in preventing the entry of unwarranted persons and effects is at its zenith at the border,[30] Congress "has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant . . .."[31] Until September 4, 2008, there had been no ruling in the Third Circuit as to what constituted a "routine search." As for Officer Ogg, he was located in San Juan, Puerto Rico, in the First Circuit. There had not been any such ruling in the First Circuit, and the First Circuit courts would not be bound by *Whitted*, a Third Circuit case.

When such a ruling is made, a ruling which affects the procedures used in border searches, it is beyond belief that within two days the government could determine what was "reasonable suspicion" and what new policy was required to conform to the ruling, much less communicate that new policy to the CBP officers. We can only conclude that as of September 5, 2008, it was not clearly established in either the Third Circuit or the First Circuit that a search of a cruise ship cabin at the border had to be supported by

---

[25] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[26] *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *Ashcroft*, 563 U.S. at 741).

[27] *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citation omitted); *see also L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016).

[28] *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation omitted).

[29] *See, e.g., Montoya*, 473 U.S. at 539-40.

[30] *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004).

[31] *Id.* at 153.

reasonable suspicion. Accordingly, under the circumstances that Officer Ogg confronted, he did not violate clearly established law by entering lookouts for the three passengers the day after we issued our decision in *Whitted*. He is entitled to qualified immunity.

We conclude that the same situation applies to the St. Thomas officers. On September 6, the *Whitted* standard was no more clearly established than it had been the day before. Moreover, if the St. Thomas officers had been aware of *Whitted*, they would have known that *Whitted* held that unsubstantiated information from TECS can establish reasonable suspicion.[32]

For these reasons, we conclude that the *Whitted* standard was not clearly established in the Third Circuit, or the First Circuit, on September 5 or 6. Within one or two days, neither Officer Ogg nor the St. Thomas officers could reasonably be expected to have learned of this development in our Fourth Amendment jurisprudence. At that time, it would not have been beyond debate that, absent reasonable suspicion, the Fourth Amendment prohibited the search of the travelers' cabins. For purposes of qualified immunity, a legal principle does not become "clearly established" the day we announce a decision, or even one or two days later.

This holding is informed by the overarching aim of the qualified immunity doctrine to insulate from civil liability "all but the plainly incompetent or those who knowingly violate the law,"[33] and the need to ensure that the relevant legal principle is framed with particularity[34] and settled "beyond debate."[35] We are, however, deciding only this case. For that reason, we decline to draw a bright line demarcating when a legal principle becomes "clearly established." We leave that exercise for another day.

Finally, the tort claims against the United States also fail because of the FTCA's discretionary function exception. The FTCA provides a limited waiver of sovereign immunity in certain tort actions against the United States for money damages.[36] That waiver does not extend to various types of government conduct enumerated in 28 U.S.C.

---

[32] 541 F.3d at 490.

[33] *White*, 137 S. Ct. at 552.

[34] *Id.*

[35] *Plumhoff*, 134 S. Ct. at 2023.

[36] 28 U.S.C. § 1346(b)(1).

§ 2680, including "the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused."[37]

The travelers do not dispute that Officer Ogg's entry of "lookouts" and the searches that followed were discretionary acts under the "discretionary function" exception.[38]  Rather, they argue that the United States is not shielded from liability because the officers in this case, though exercising their discretion, violated "clearly established . . . constitutional rights of which a reasonable person would have known."[39]

Because, for the reasons set out above, the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail.

V.

For the reasons stated above, we will affirm the judgment of the District Court.

---

[37] 28 U.S.C. § 2680(a).  Discretionary acts and omissions "involv[e] an element of judgment or choice."  Conduct is non-discretionary only if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and the government "employee has no rightful option but to adhere to the directive."  *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

[38] Br. at 63-64.

[39] *Harlow*, 457 U.S. at 818.

10